Oral argument not to exceed 15 minutes outside. Mark Frederick Horning for the appellant. Good morning. May I please the court? I'd like to reserve three minutes of my time for a buck. You may. The district court's decision below ought to be overturned for two basic reasons. One is that the district judge did not give effect to the unambiguous language of the sublimate on ICASOP's liability in flood-prone areas. The second is that she completely nullified the purpose of that provision outside of the U.S. Let me start with the purpose because that puts the language in context. Federal Mogul is a worldwide corporation. There are probably 100 countries that do not have a government agency that draws up floodplain maps. Federal Mogul operates in a lot of them. They have operations in 25 countries outside the U.S. Many are in flood-prone countries, not just Thailand, China, India, Brazil, Mexico. And so what ICASOP had to do to protect itself against risk in these flood-prone areas was to develop some standard that was different from the maps that are drawn up in the U.S. because there were no maps in many of these countries. And so it relied on the hydrological principle or concept of a 100-year floodplain. Now, this was negotiated with Federal Mogul. It retained the services of Marsh, which is the largest and most sophisticated insurance broker in the world. And the language in the… Is that Marsh and McLennan? Yes. They changed your name. So they negotiated the language of this policy, including negotiations on the supplements that are an issue in this case. What the district court did in basically saying you have to have a map is she perverted the approach outside the U.S. She's actually giving ICASOP more protection in the less flood-prone areas in the U.S. than in many flood-prone areas outside of the United States. Now, let me turn to the language of the supplement. Subsection B, there are three provisions in the supplement. Subsection B covers areas outside of the U.S. It does not refer to designation on a governmental map. It refers only to whether an area is located within a 100-year floodplain. And then it uses the words or its worldwide equivalent, which strikes me as a little odd just in the sense that a 100-year floodplain is a scientific or hydrological name that we can litigate. But why did they add or its worldwide equivalent, and what did that mean? Because some countries, the concept is the same scientifically. Some countries don't use the terminology of a 100-year floodplain. So worldwide equivalent modifies 100-year floodplain to cover all terminology that might be used for it. But it does not modify the map language as it would in subsection A and C. Now, I'd like to turn to the contrast that you just raised, Your Honor, that is that subsection A refers to designation on a governmental map. Well, specific maps. U.S., yeah, the FEMA maps in the U.S. None of them, I mean, by those names, they don't exist outside the U.S., do they? Correct. But subsection C also refers to other recognized governmental authority. And so that subsection refers to governmental maps outside of the U.S. Subsection B does not contain any of that language. It doesn't refer to governmental authority. It doesn't refer to a map. It refers only to the hydrological principle of a 100-year floodplain. And so it's not just the language of subsection B, but it's the contrast between B on one hand and A and C on the other. And as our brief points out in the Rodriguez case, this Court has said when you have closely related provisions in a contract and there's language in one that is not repeated in the other, that must be presumed to be a deliberate choice of the authors of the policy. Now, let me turn now to the evidence that ICASAP put in that the flood occurred in a 100-year floodplain. The district court basically said there's got to be a history of prior flooding. But the primary evidence that ICASAP put in was, in fact, a history of prior flooding. This area had flooded five times in the past 28 years. That's much more frequently than a 100-year flood. And so if you ignore all the other evidence in the record, this history of continuous flooding in this zone indicates it's in a 100-year floodplain. Counsel, I'm looking at the page. This is page 23 of the team consulting engineering and management company report. There's a nice chart, and it shows the five floods that you refer to, but only the 2011 flood is referred to as being a 100-year flood. And so I wasn't quite sure what to make of that or whether your factory or whatever, or their factory, I guess, was reached by each of these five floods or only by the last one. It was reached only by the last one, but the concept of a 100-year flood means a big flood. That is, it's a once-in-a-century flood. It's very wide. So when you have floods of lesser scope, as those five floods were, they are by definition within the 100-year floodplain. In fact, one governmental map that we refer to found a 5-year floodplain. Another found a 30-year floodplain. But I thought I heard you say that only the last one actually reached their facility. Correct. So it sounds like you have a 100-year flood that occurred once within 15, 18, some lesser period of time. Now that neither makes it in or out on a statistical basis, but it doesn't affirmatively make it in, it seems to me, as opposed to making it a factual issue if there were to be a remand. The phraseology of sublimate refers to an area, not just the pinpoint location of the federal mobile facility. It refers to whether the area has been flooded and the area was flooded so that by definition, if you had a flood of this greater frequency, that's a smaller flood, it's going to be within the larger area of a 100-year floodplain. But what I'd like to add, Your Honor, is that Federal Mobile did not put in rebuttal evidence on this point. Their position was you have to have a map. And so when we came forward with evidence in support of our summary judgment motion, we put in the expert report you just referred to and other evidence of historical flooding and governmental maps. They elected not to rebut that. And so under the Anderson v. Liberty lobby line of cases, Celotex line of cases, their failure to come forward with rebuttal evidence against the move-in means that summary judgment should have been entered against them as a matter of law. So even if some of the evidence, which they say is not qualified or is ambiguous, even if you exclude some of that evidence, there's enough in the record to support a grant of summary judgment to my client because they elected not to come in with rebuttal evidence. Let me ask you about interpretation of insurance contracts here. This is an exclusion and should be treated as an exclusion here. That is that the insurance company has the burden of showing that the exclusion is met. Is that correct? We disagree that it's an exclusion, but we don't think it's necessary to decide that for the outcome of this case. Let me take both those points. First, a limit is intrinsically a part of coverage, not an exclusion. In other words, no insurer in its right mind is going to provide infinite coverage for damage. So when they cover apparel, there's always a limit, X amount of dollars, whether it's fire, earthquake, flood. Intrinsically, a limit is part of a coverage term as to which the insured bears the burden of proof. Assume I'm wrong and that it is in fact an exclusion as to which ICASOP had the burden of proof. We came forward with proof that it's in a 100-year flood plain. They elected not to come back with rebuttal evidence. Even if you regard the sublimate as an exclusion, not as a coverage term, we met our burden of proof, and they elected not to come in with rebuttal evidence. Let me turn very quickly... If they don't offer any proof, any proof that you offer is going to satisfy your burden? Yes. Is that your claim, any proof that you may offer, if there's nothing on the other side will satisfy your burden? Yes. We came forward with various kinds of evidence, historical flood maps, hydraulic modeling, two governmental maps that were requested by the government of Thailand and the Bangkok city government. They came forward with no rebuttal evidence because their experts took the position that the contract should be interpreted to cover only a governmental map. Your citation to Anderson and Celotex, isn't that usually not that the person making the motion comes forward with evidence, but simply points to the lack of evidence on the other side? So they wouldn't seem to be directly on point here. Well, I believe, I may have quoted the wrong case, but it works both ways. You're correct that the move-in can't just point to the lack of evidence on the other side. The move-in has to come in with affirmative evidence supporting its motion, which ICASOP did. I thought that's exactly what Anderson says, is you point to the lack of evidence on the other side, and the other side has to come back. The other side has to not just say that evidence is wrong. They have to come forward with rebuttal evidence of their own, and they elected not to do that, and that's because the stance they took was you have to have a map. Do you have any other case other than Anderson and Celotex? Because to me that doesn't match up. I think we cited, I don't have my briefs in front of me, Your Honor, but I think we had a Sixth Circuit, we had a Sixth Circuit site supporting that proposition. So this is, but it's with respect to a, not to a lack of evidence, but to an issue that would otherwise be a genuine issue of material fact. That is, you treated it as an issue of fact because you came in with all of your facts. That's correct, Your Honor. I'd like to reserve the rest of my time. Okay. Thank you. May it please the Court. John Aioli for Federal Mogul Corporation. There are a couple of points I'd like to make in response to Mr. Horning's argument. The first one is we have a, the parties have a very drastic difference of opinion about how this policy should work. We are saying this is a matter for underwriting, meaning at the time of underwriting the insurance company is not taking a gamble that it's giving $200 million or $70 million or $30 million worth of coverage at the time the policy is placed. They have the ability to underwrite the risk that is transferred at the underwriting stage, which what they're saying in their argument is they're going to wait until the claim is made and then figure out how much risk was transferred. Our basic point with respect to a 100-year flood plain is our experts have said that in rather detailed opinions, a 100-year flood plain, if you think of it as a theoretical construct, it's very easy to say. If you think of it as something that is drawn on the ground, that's incredibly difficult to determine without any absolutely preordained agreed procedures. And that's where the difference in the parties lies, I think. But that's a pretty good argument as to why maybe this contract shouldn't have been written the way that it was. It certainly would have been easy to either say if there isn't a flood plain map, we won't insure anything for flooding because we don't know how bad it is, or we trust the rest of the world, we don't trust the U.S., but we'll cover everything. But they wrote what they did, which was intended to have some purpose of protection for them, wasn't it? Let me offer this. This terminology, in our view, when read together, actually does support our interpretation, meaning if you read the high hazard zones for flood provision as a whole, as it should be read, the meaning, in our view, is very clear. And that you couldn't be interpreted as they interpret it asks for an impossibility. It asks for someone to go out on a field trip after a flood and figure out were you in a 100-year flood. We have a lot of experts, but your reading under B means that they, in any country that doesn't have maps, they're on the hook for everything, right? Unless it's been otherwise excluded like they did for the Netherlands, for example, or they did in Germany, or they did for earth movement, yes. We would say if there hasn't either been a predetermined map that shows the flood plain, or you could imagine other circumstances, that is, the insurance company in underwriting, again, saying, look, here are the countries where you have properties. We're going to tell you they're in 100-year flood. You could do something differently, but both sides signed this particular document, and your position is that an area which is within a 100-year flood plain means an area which is within a 100-year flood plain as designated by some government body, UN body, hydrological body, some country we like. I mean, there's an awful lot of qualifiers you would put in if you wanted to write it that way, wouldn't you? Potential qualifiers. I'm not saying you had to have each of them, but you'd have to write something like that, wouldn't you? The wording could certainly be improved. Well, it can be improved. It would have to be put in and determined. Your Honor, yes, our point is that the only reasonable way to read this, because of what we know about how hard it is to develop a 100-year flood plain, and to have some idea what risk is being transferred, is to have a map by the country where the property is located. And we have many, many countries that have that kind of map. Let me offer this. You're basically saying, it seems to me, that where you have uncertainty, as in this case, unpredictability, that, in this case, should fall on the insurance company. It should. The liability should, because that's basically what you're saying. Here, nobody knows a 100-year flood plain, whether it is in it or not in it, and it's just an uncertain situation. It is. It's an invitation to a fight at the point of a claim. Let me offer one hypothetical. Let's take the case of Germany. They have 100-year flood plains in Germany because there's a regulatory map. In our reading, fine. We know we're in a 100-year flood plain. There's a map in Germany. It's a matter of public record. And many other countries have these maps. Under the interpretation of the insurance company. And whether they're right or not, you can rely on them despite the fact that they may be in error. It's a regulatory status, right or wrong. The awfully good evidence. We know these maps actually are good for the date they are put into place, but we know from Katrina down in New Orleans and the Red River in North Dakota that the maps, what floods is going to change just because of everything that happens. Take my hypothetical. We're in Germany and there's a 100-year flood plain on a map. And let's take the case of our facility and it's not in the 100-year flood plain. Under the insurance company's interpretation, that map means nothing. Why does it mean nothing? Why is it not very strong evidence? You might come in and say, well, this map was drawn up in communist East Germany and we know that the party boss submitted to bribery or the political influence. Now, you could raise that, but the map on its face would be very strong evidence. It wouldn't mean nothing. It would just not be conclusive. I accept that. Okay. There's a big difference. There is. Let me under this hypothetical say that let's say through some change in hydrology or hydraulics that you weren't in the 100-year flood plain before, but now the insurance company says you are, even though you've got a map. I guess what I'm saying is their interpretation effectively renders not completely useless, but calls into question and throws into uncertainty your status anywhere in the world other than the U.S. And if that was a good argument, why didn't you write it in? I mean, you seem to say, well, it might be good for us as an insured some places, and other places the other language would be better. But either side, I mean, this was negotiated, right? This is not a contract of adhesion. This was not by any stretch a manuscript. This is a form that AIG companies use all over the place, and they've litigated it before. And so this was not like it was written strictly for this provision, strictly for. . . I mean, lots of things were negotiated in this overall document. I mean, you have a list of counties in Kentucky where the new Madrid Fault applies. Let me raise one other thing that has never been explained. Mr. Horning offered an explanation. He said the worldwide equivalent term in B, if as they have said stridently in the district court and also on appeal that the 100-year flood plain is a universal concept, it eliminates the worldwide equivalent terminology. And our point of view is the worldwide equivalent really is a referent to flood maps because we know in other places that have flood maps, they use other terminology. Well, but then if you went that way, it still is an or, an area which is within a 100-year flood plain, or has a good map. That would be even worse for your argument, wouldn't it? Because if worldwide equivalent means places with good maps, then it eliminates a lot of the uncertainty. It just means if you're in a country, you know, if you're in Cambodia or Burundi or someplace where the government is not perhaps as assiduous as other countries, then again you'd be at complete risk. I didn't hear the interpretation offered by the insurance company to include that concept. Oh, I just heard it from you. That was why I was asking. Well, what we're saying is if you are in an area where there is a 100-year flood plain, then whether you metaphysically are or aren't in one, that should be determinative. It helps parties know what their risk is. It helps parties know – you can go check it. It's a third party that does the flood plain. It's not a litigated dispute. Their experts went out without any word to us as to how they were going to create their studies and did them and then presented them to us in the context of exchanged expert reports. And I should say, they didn't come up with a flood plain. They didn't. They said, well, we don't have to say where the flood plain is. We're just going to tell you that you're in it. And that's contrary – I mean, if you look at the title of this whole section, it's high hazard zones. They've never given us a zone for a 100-year flood plain in the area of the property. And, in fact, they didn't have any protocols that they followed. I asked them in deposition, well, what protocol did you follow? And they said, well, we did basically what we thought was a good way to go about it. They didn't follow a procedure like you would in the U.S., which is specified by regulation. They didn't follow a procedure like specified in other countries that have it. They basically said, we think you're in the flood plain wherever the contours of that flood plain might be. Are you saying that only if there's a map, something official, that you can show a 100-year flood plain? That's what you're saying? That is our basic point. You can imagine a situation where the parties by agreement have come up with something in advance during underwriting. But absent that, our position is it should be something that is a regulatory map that anyone would be on notice. If there's evidence that there were three floods within the last 100 years, then that would be sufficient, even though there were no map? We would say no. And the reason for that is a 100-year flood might never happen in 1,000 years. It could happen in three years. You would have to determine the return period of the flood, which takes an agreed-upon process. And, in fact, the flood that happened in 2011, there have been widely, drastically varying estimates. They go into many hundreds of years, which have flooded anything no matter where. You are basically saying what I guess I ask. You're just saying if there is uncertainty about it and there's no way to know, the liability necessarily falls on the insurance company? In this case, Your Honor, yes. And I'm correct. That means that in any country that doesn't have such maps, you can be at the bottom of the river and they'll still cover it. Ideally, that would be a very bad underwriting choice because they have information on every one of our properties. They know where the properties are. They know what the risk in that country is. And just like they do for windstorm and they do for quake, they did for Netherlands, they did for Germany. They could put, hey, these countries, this is your limit. And that, in our view, absent... Obviously, you could have. There's all sorts of strange and interesting things in this document in terms of how much you cover for furs and so on. Is there anything in the record about how the company figures or, in this case, how the company figured its premiums? I do not believe there's anything in the record that would go on a property-by-property basis. There is premium information, but I don't think anything... What's the information show about what the premium was here? I think it was $600,000, thereabouts, something like that, for the year. I believe that's what it was. It should be on the title page of the policy. And that covered how many locations? I don't have the number off the top of my head. It was many, yes. And this has a worldwide policy. I mean, correct me if I'm wrong, I had the impression that if you started to build a new plant in Burundi within this year, at least it would still be covered. It was not a list of exact properties. It's everything that Federal Mogul owns. They might rejigger it every year if you had built a lot of new plants, but you were covered for whatever you did. The way this policy worked, you would get some automatic coverage for a short period of time if you built something new, but in the underwriting submission, Federal Mogul gave a list of all the properties, gave a list of where they were, and as we see in the record, there are risk reports where engineers went out to each location, including twice to this location, once three months before the flood, and said, risk of flooding here is slight. And we looked for a flood map. There's no flood map in this area, so they couldn't report back. And there was a risk report from, I think it was four years earlier, that said risk of flooding is light. And so this was not a place where anyone expected this flood to occur. I found the page. The premium was $604,000, and plus a few taxes from Kentucky and some other states added a little more. If I may, on our conditional cross-appeal in my last few seconds, our point, I think we covered it very adequately in the briefing, but our point is this. The policy has physical damage coverage, and it has time element damage coverage. The time element does not have... The time element is sort of loss of use, loss of profits, that kind of thing. So that if we were to go the other way and at the same time decided that it had to go for trial, then all of that would be open at trial if we interpreted the contract here your way. Number one, if you went back for trial, you could win on whether it really was an 100-flood plain, but if it wasn't, you could still get your time element. That's your submission. We submit that the time element could be decided on summary judgment, and if there were a remand, it could go back simply on the flood plain. Okay. All right. Counsel. Let me first address Judge Merritt's questions about ambiguity. Federal mogul's position below in the district holding was not that this was ambiguous and should be construed against the insurer, but that it was completely unambiguous. And so their position has never been there's an ambiguity here that ought to be construed against my client. I wasn't suggesting ambiguity. I just think nobody knows in this particular case whether it is or it isn't in the 100-year flood plain. I haven't seen any evidence that relieves the uncertainty and the unpredictability of it. There is some evidence, Your Honor. That is, there are two governmental maps commissioned by the government of Thailand and by Bangkok Municipal Authority that looked and found that there was a 5-year and a 30-year flood plain in these areas. Now, those are exactly the kind of maps that the federal mogul says should be relied upon. They're commissioned by a governmental authority, and they're done for a governmental purpose, to assess flood risk and government measures to mitigate that risk. So if I'm wrong and there is some ambiguity here, there is enough evidence in the record to show that Isaac Hopp's position was correct. Are you saying that those maps show that this facility is within a 5-year flood plain? Right. That's correct, Your Honor. And what's the record site for that? It's in our briefs, but it's referred to in several cases. One study was done by the Japanese governmental agency under U.N. auspices requested by the government of Thailand, and the other was done by a consultant that was funded by the World Bank and was commissioned by the municipal government of Bangkok. I just want to be sure, because whether I'm hearing you right, that I thought you again said that there were these floods, but only the 2011 flood actually reached their property, and yet it was within a 5-year flood plain, but they've only had one in 16, 18 years. And that's measured by area? I understand. I'm just trying to get your submission, because at least for me it's leaving it in a potentially issue of fact either way, but we'll see. But so the maps that you're referring to are not in the Rojana Industrial Park flood plain study? They're in a different document? They were not part of our experts' opinions. They were done by independent authority, and they're submitted with the expert report. Let me quickly address the Federal Mogul's Cross Appeal. It's not correct that the time element, that the sublimit is only applicable to physical damage and not the time element. If you look at the very front of the policy, the $30 million sublimit is described as an annual aggregate. That's different from other sublimits, and I'll read the definition. The limit of liability or sublimit... What page are you reading from? I've got the 74-page document up front. I believe it's on page 5 of the policy. That's where the annual aggregate language, if you see there's a $200 million, then $70 million, and then $30 million, and the $30 million is described as an annual aggregate. That means it covers everything. The maximum that ICASOP was liable for under any type of coverage was $30 million, whether it's physical damage or time element or some combination. And the language I... Also, I believe on page 7 of the policy, Your Honor, there's a description of what an annual aggregate means and how it limits coverage under any type of coverage in the policy. Regardless of the number of coverages... Right, that's exactly... Perils... Exactly, Your Honor. That's what you're reading at, okay. No more questions. But then it has... But you're saying this is not a deductible, this is a limitation. That's right. All right. Any other questions, judges? Okay, thank you. The case will be submitted.